David S. MUNOZ, Plaintiff,

v.

William KOLENDER, in his individual and official capacity as the Sheriff, and San Diego County Sheriff's Department, Defendant.

No. 00cv2323–LAB(CJA).

United States District Court, S.D. California.

June 14, 2002.

---

David Munoz, Atascadaro, CA, pro se.

Deborah Anne McCarthy, Senior Deputy, County of San Diego Office of County Counsel, San Diego, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BURNS, United States Magistrate Judge.

This matter is before the court on defendant's Motion For Summary Judgment ("Motion") in this 42 U.S.C. § 1983 action. Plaintiff David S. Munoz ("Munoz") is proceeding *pro se* and *in forma pauperis* with a verified Complaint against San Diego County Sheriff, William Kolender ("Sheriff Kolender" or "Defendant"). He challenges his confinement in County Jail and the conditions of his confinement there while awaiting judicial proceedings to determine his status under California's Sexually Violent Predator Act. Munoz filed a verified Opposition to the Motion. Sheriff Kolender filed no Reply. The parties have consented to the jurisdiction of the undersigned Magistrate Judge for all purposes. Dkt. Nos. 17, 24. Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues appropriate for decision on the papers and without oral argument. For the reasons set forth below, the court *GRANTS* summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *State Court Proceedings And Confinement History*

Munoz appears to have been in uninterrupted state custody with the California

Department of Corrections ("CDC"), the County Sheriff, or the Department of Mental Health ("DMH") at least since his December 1, 1992 plea hearing in San Diego County Superior Court Case No. CR 132597. He is presently confined at Atascadero State Hospital ("Atascadero") pursuant to his second consecutive civil commitment as a sexually violent predator ("SVP") under California's Sexually Violent Predators Act, WELF. & INST.CODE 6600, *et seq.* ("SVPA"), imposed by state court Order entered August 4, 2000.

Munoz summarizes the challenged County Jail confinement periods: he was booked into County Jail from the Donovan facility on "2–17–1998, then transported to (A.S.H.) [Atascadero] 5–14–98. On 7–27–98, I was transported back to County Jail of San Diego, 9–10–98 transported to (A.S.H.). On 7–29–99, I was transported back to County Jail of San Diego. On 11–10–99 I was transported back to (A.S.H.), on 4–20–00 I was transported back to County Jail of San Diego, on 8–24–00 I again was transported back to (A.S.H.)."[1] Opp. p. 6. Based on the exhibits to the Complaint, Motion, and Opposition, and supplemental briefing from County Counsel's Office requested by the court, the chronology of Munoz's state court proceedings and custody status emerges as follows.

On August 25, 1989, Munoz pled guilty, in San Diego County Superior Court Case No. CR 104403, to the crime of Lewd Act with a Child Under 14, in violation of CAL.PENAL CODE § 288(a). He was sentenced to state prison for a determinate term of six years. On November 2, 1989, it appears his sentence or the execution of his sentence was suspended, and he was granted a probation term of five years in that case. On July 13, 1990, he was ac-

cused of violating his probation. At the probation violation hearing on September 14, 1990, Munoz admitted the violation. According to Defendant's supplemental briefing, Munoz's probation in Case Number CR 104403 was "revoked, reinstated and modified" with the direction "Munoz to remain in El Shaddai program and not to terminate without permission of program and probation officer." Dkt. No. 39, Suppl. Briefing, Summary of Convictions. Munoz appears then to have been again released on probation.

On December 1, 1992, in case number CR 132597, Munoz pled guilty to new charges of three counts for violation of CAL.PENAL CODE § 288(a) and one count for committing residential burglary. He admitted a prior serious felony conviction. His probation (presumably in CR 104403) was summarily revoked. On February 10, 1993, the court sentenced him to the CDC for a total of eleven (11) years in the new case and six (6) years in CR 104403, to run concurrently, and ordered him transferred to R.J. Donovan Correctional Facility. Dkt. No. 39, Suppl. Briefing, p. 6; *see also* Mot. Ex. "A". The Abstract of Judgment in Case No. CR 132597 records that Munoz received 369 days of credit for time spent in custody. Dkt. No. 39, Suppl. Briefing, pp. 7, 8.

On January 29, 1998, the People filed a Petition for Involuntary Treatment ("Petition") pursuant to the SVPA alleging Munoz should be committed to the State Department of Mental Health. As discussed below, the SVPA statutory scheme provides for the civil detention, rather than release from custody at the conclusion of a criminal sentence, of a person who is adjudicated a SVP. On February 17, 1998, Munoz was booked into County Jail. Op. Exs.

---

**1.** The four County Jail confinement periods challenged in Munoz's Complaint are thus: February 16, 1998 through May 14, 1998; July 24, 1998 through September 10, 1998; July 29, 1999 through November 11, 1999; and April 20, 2000 through August 14, 2000.

"A", "C". On March 30, 1998, the court issued an Order For Commitment Pending Trial, instructing that Defendant transport Munoz to Atascadero "at the Sheriff's earliest convenience" pending trial set for July 21, 1998. Opp. Ex. "B". It does not appear from the record presented that Munoz was actually transferred until May 14, 1998. *See* Opp. Ex. "A", Release Code section. However, an intervening court appearance occurred.

On April 22, 1998, San Diego County Superior Court motion hearing minutes, referencing only Case No. CR 104403, indicate that Munoz was present and note that his "state prison commit [*sic*] has expired (3–27–98)." The court ordered Munoz "remanded to custody of sheriff," with the direction that "[t]he defendant is to be transported to Atascadero for housing pending trial per [WELF. & INST.CODE] 6600. New trans[fer]." The balance of the statement is obscured on the court's copy. Dkt. No. 39, Suppl. Briefing, p. 5. Munoz was transferred to Atascadero on May 14, 1998. Opp. Ex. "C". On July 27, 1998, he was transferred back to County Jail for his SVP trial. Opp. Ex. "C". On July 30, 1998, Munoz was adjudicated a SVP and was committed to the DMH, Atascadero, for the two-year commitment period provided in the SVPA. *See* discussion in Mot. Ex. "A". He was transported back to Atascadero on September 10, 1998. Opp. Ex. "C".

After one year of the two-year confinement period, Munoz petitioned for an Order To Show Cause seeking judicial review of his confinement status, as permitted under WELF. & INST.CODE § 6605(b). On July 29, 1999, he was transferred from Atascadero to County Jail for purposes of participating in the judicial proceeding. On November 3, 1999, the court denied the petition as frivolous. Opp. Ex. "B". Munoz was transported back to Atascadero on November 10, 1999. Opp. Ex. "C".

On March 30, 2000, in response to the People's petition to extend Munoz's SVP commitment for an additional two years, the court ordered "that the Sheriff of the County of San Diego receive [Munoz] from the Medical Director of Atascadero State Hospital and transport and deliver [him] for arraignment on the petition . . . ," set for April 21, 2000. Mot. Ex. "B". The court's March 30, 2000 Order in response to the People's second SVPA petition alludes to both underlying criminal cases (CR 104403 and CR 132597). Mot. Ex. "B". Munoz was booked into County Jail from Atascadero on April 20, 2000. Mot. Ex. "C". The Sheriff's Department issued a segregated housing order for Munoz on the same date. Mot. Ex. "K". He appeared at his SVP arraignment on April 21, 2000 and denied the SVP allegation. Mot. Ex. "D". The court "remanded defendant to the custody of the Sheriff without bail," until a Probable Cause hearing, set for May 17, 2000. *Id.* The probable cause hearing was held on May 17, 2000. The minutes of that hearing reference both Case Nos. CR 104403 and CR 132597, but note "the hearing is being held in response to a *single* Petition for Continued Involuntary Treatment of a Sexually Violent Predator filed by Petitioner on March 30, 2000 . . . ." Mot. Ex. "E" (emphasis in original). The court found probable cause to believe Munoz was likely to engage in sexually violent predatory criminal behavior upon release and set a trial date of May 26, 2000. The court "remanded defendant to the custody of the Sheriff without bail." Mot. Exs. "E", "F". On May 26, 2000, the trial date was reset to July 14, 2000. Mot. Ex. "G". Again, the court "remanded defendant to the custody of the Sheriff without bail." *Id.* On July 14, 2000, the trial was continued to July 19, 2000, and the court for a third time "remanded defendant to the custody of the Sheriff without bail". Mot. Ex. "H". On

July 19, 2000, court minutes record: "case returned from Dept. 54. Reassigned to Dept. 41 for trial." Munoz was once again ordered "remanded to the custody of the Sheriff." Mot. Ex. "I".

In its August 4, 2000 Order, the Superior Court granted the People's Petition and ordered a second two-year commitment to the Department of Mental Health after a jury determined Munoz met the SVP criteria and "is likely to engage in acts of sexual violence upon his/her release from the California Department of Corrections or other secure facility." Mot. Ex. "A", "J". That Order again "remanded defendant to the custody of the Sheriff of San Diego County without bail," but also directed the Sheriff to transport Munoz to Atascadero "at the Sheriff's earliest convenience." The Order further directed "the Medical Director of that institution" to take custody of Munoz from the Sheriff for purposes of the ordered commitment. Mot. Ex. "A", "J". Munoz was transferred back to Atascadero on August 14, 2000. Opp. Ex. "C". Accordingly, for the entire period April 20, 2000 through August 14, 2000, the record reflects Defendant had court-ordered custody of Munoz for the purpose of producing him for judicial proceedings. Munoz anticipates in his Complaint renewed SVP proceedings in July 2002.

Defendant pursues his summary judgment Motion on the assumption that of the four periods of County Jail confinement Munoz challenges as violating his constitutional rights (two in 1998, one in 1999, and one in 2000), only the April 20, 2000 through August 14, 2000 period is not barred by the statute of limitations. In reliance on that assumption, Defendant briefs only the issues associated with Munoz's year 2000 County Jail confinement.

## B. Procedural History In Federal Court

Munoz filed his 42 U.S.C. § 1983 Complaint on November 20, 2000. He succinctly states his case: "the issue is not if the Plaintiff is a sexually violent predator, the issue in front of the court is whether the Defendant is responsible for violation of Plaintiff's [constitutional rights] ... while in the custody of William Kolender, Sheriff of San Diego County Jail Facility." Opp. 3:4–10. In Count One, Munoz alleges cruel and unusual punishment in violation of the Eighth Amendment. In Count Two, he alleges Fourteenth Amendment Equal Protection violations. The claims arise out of the fact and the circumstances of his confinement in San Diego County Jail during the four periods of his detention there while awaiting civil proceedings related to his SVP status.[2]

Munoz bases his claims on an entitlement to be housed at all times in a "civil environment," in particular a mental health facility, rather than in County Jail. Compl. p. 6. He claims his detention in County Jail was "in violation of State law." Opp. 4:9–10. He presents that claim as an Equal Protection violation. His Eighth Amendment claim alleges the conditions of his confinement while in County Jail constituted cruel and unusual punishment. He seeks damages for those detentions as well as a permanent injunction to prevent Defendant from housing him at the County Jail again during the pendency of future SVP court proceedings.

**2.** Munoz's Opposition asserts, in addition, purported violations of a right to privacy and other rights under the First Amendment and Fourth Amendment (Opp. p. 9), an allegation of "unlawful imprisonment" (Opp. 5:10), and lack of court jurisdiction to order him housed in a County Jail facility (Opp. 8:1). Only the claims alleged in the Complaint are properly before the court.

Defendant answered the Complaint on February 7, 2001. On October 15, 2001, he moved for summary judgment on grounds Munoz fails to state a claim, contending: Munoz's claims with respect to the County Jail confinements in 1998 and 1999 are barred by the statute of limitations; his incarceration at County Jail was lawful; Munoz fails to state a claim against Sheriff Kolender in either his official or his personal capacity; and he fails to state a claim for the constitutional violations alleged.

The parties consented to Magistrate Judge jurisdiction before the Motion was decided, and the Motion was transferred to the calendar of the undersigned Magistrate Judge. Dkt. Nos. 17, 24. The court issued Munoz a *Klingele/Rand* notice after the transfer, to ensure he understood the implications of a grant of summary judgment and to permit him the opportunity to supplement his Opposition accordingly. Dkt. No. 28. The court construed Munoz's terse response to that notice as his election to rely on the more elaborated Opposition he had filed on November 9, 2001. Dkt. No. 31.

The court requested clarifying briefing from County Counsel regarding Munoz's convictions, confinement, and parole history in the underlying criminal cases and civil commitments. Ambiguities exist in the record, created in part by his service of concurrent criminal sentences of different lengths and the reference in his first SVP adjudication only to Case No. CR 104403. Case No. CR 104403 had resulted in the six-year sentence to be served concurrently with the eleven-year term imposed in Case No. CR 132597. Both sentences were imposed on February 10, 1993. The People's January 1998 SVPA petition was accordingly presented five years into Munoz's six year sentence, with six years remaining on his eleven-year sentence in Case No. CR 132597, excluding any early release credits he may have earned. Defendant proceeds on the assumption Munoz's prison commitment(s) expired on the March 27, 1998, in reliance on the Superior Court's hearing minutes on April 22, 1998 referencing only Case No. CR 104403. However, Munoz states his CDC prison sentence and parole term "expired on March 16, 2001." Opp. 2:7–8. Defendant responded to the court's request for supplemental briefing on April 18, 2002. Dkt. Nos. 38, 39. Despite the court's attempt to clarify the record with respect to the total duration of Munoz's criminal custody—which affects both the statute of limitations analysis and the Eighth Amendment analysis—questions of fact remain unresolved.

## II. DISCUSSION

### A. *Legal Standards*

#### 1. *42 U.S.C. § 1983 Claims*

Plaintiffs have no cause of action directly under the United States Constitution. A litigant seeking damages based on a violation of a constitutional right must rely on 42 U.S.C. § 1983. *Azul–Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir.1992); *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (42 U.S.C. § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal citations omitted). 42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To prevail on a 42 U.S.C. § 1983 claim, the claimant must prove conduct by a person acting under color of state law deprived the claimant of a federal constitutional or federal legal right. *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir.1986) (to state a cause of action under § 1983, a plaintiff must "plead that (1) the defendants acted under color of state law and (2) deprived plaintiff of rights secured by the Constitution or federal statutes"); *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Courts must liberally construe *pro se* litigants' complaints. *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

 A person acts "under color of state law" for purposes of 42 U.S.C. § 1983 if he "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West,* 487 U.S. at 49, 108 S.Ct. 2250 (citation omitted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Johnson v. Knowles,* 113 F.3d 1114, 1117 (9th Cir.1997) (citation omitted). Munoz's allegations against Sheriff Kolender appear to describe only conduct under color of state law.

 Munoz complains, among other things, his detention in San Diego County Jail does not comply with California state law and regulations. Violations of state law standing alone do not afford a basis for relief in federal civil rights litigation. An essential element of any 42 U.S.C. § 1983 claim is that the challenged conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States.[3] 42 U.S.C. § 1983; *see West,* 487 U.S. at 49, 108 S.Ct. 2250; *WMX Techs., Inc. v. Miller,* 197 F.3d, 367, 372 (9th Cir.1999). However, state regulations can sometimes give rise to liberty interests that are protected by the Fourteenth Amendment. *Meachum v. Fano,* 427 U.S. 215, 225–27, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). If the state law at issue created a liberty interest such that a violation of that law constitutes a violation of due process, the violation may be cognizable under 42 U.S.C. § 1983. *Wolff,* 418 U.S. at 557–58, 94 S.Ct. 2963; *see, e.g., Carlo v. City of Chino,* 105 F.3d 493 (9th Cir.1997) (finding that California law entitling *arrestees* access to telephone calls created a protected liberty interest so that violation of that law resulted in a violation of plaintiff's procedural due process rights). The defendant must have violated such a right for liability to attach.

### 2. *Summary Judgment*

Defendant moves for summary judgment but challenges the Complaint for "failure to state a claim." Mot. 4:7–8, 5:7–8. The standards and considerations for judicial review differ under FED. R. CIV. P. 56(c), addressing the sufficiency of the evidence, and under FED.R.CIV.P. 12(b)(6), an attack on the pleading for failure to state a claim. Neither party here sets forth the legal standards against which to measure

---

**3.** "A statute creates a right enforceable under § 1983 if: (1) the statute was intended to benefit the plaintiffs; (2) the statute imposes a binding obligation on the government unit rather than merely expressing a congressional preference for a certain kind of conduct; and

(3) the interest asserted by the plaintiff is not so vague or amorphous that it is beyond the competence of the judiciary to enforce." *Groten v. State of California,* 251 F.3d 844, 848 (2001).

their showings.[4] Both parties rely on evidence outside the pleadings. Accordingly, the court decides the Motion under summary judgment standards.

Summary judgment is properly granted when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). "A material issue of fact is one that affects the outcome of litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250–51, 106 S.Ct. 2505. "If reasonable minds could differ as to the import of the evidence," judgment should not be entered in favor of the moving party. The court should not invade the fact-finder's function to resolve issues of fact. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. However, more than some "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's function is to determine whether there exist triable issues of fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (when the historical facts controlling the application of a rule of law are not in dispute, the summary judgment motion raises a question of law for the court).

The court need only consider evidence set out in the moving or opposing papers and parts of the record specifically referred to in those papers. *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001). The court may exercise its discretion, "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." *Id.* at 1031. The court may also consider material properly submitted as part of the complaint. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555, n. 19 (9th Cir.1989). The facts to support or defeat summary judgment must be admissible under rules governing the admissibility of evidence generally. *Id.* at 1550–51. However, the court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Forsberg v. Pacific N.W. Bell Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir.1988).

The parties bear the same substantive burden of proof on summary judgment as would apply at a trial on the merits, including plaintiff's burden to establish any element essential to his case. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden to demonstrate the absence of a genuine issue of material fact and that summary judgment is proper as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–58, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party can satisfy that burden either (1) by presenting evidence that negates an essential element of the non-moving party's case, or (2)

---

**4.** In addition, the court notes with disapproval that of the six cases Defendant cites in his conclusory six-page Motion points and authorities, two were vacated or reversed and are incompletely cited in the papers. *Barrera–Echavarria v. Rison,* 21 F.3d 314 (9th Cir.1994) was vacated on rehearing by *Barrera–Echavarria v. Rison,* 44 F.3d 1441 (9th Cir.1995). *Young v. Weston,* 192 F.3d 870 (9th Cir.1999) was reversed in January 2001 by *Seling v. Young,* 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001).

by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–323, 106 S.Ct. 2548.

Once the moving party carries its burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 738 (9th Cir.2000). Although the court may not weigh evidence or make credibility determinations, conclusory allegations are insufficient to defeat summary judgment. *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981) (the court need not accept legal conclusions cast in the form of factual allegations). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." *Vigliotto v. Terry,* 873 F.2d 1201, 1203 (9th Cir.1989).

## B. *Sexually Violent Predators Act*

### 1. *SVPA Policies And Objectives*

■ California's SVPA was enacted in 1995, in response to an identified need to protect the health and safety of others from the danger posed by releasing SVPs likely to engage in acts of sexual violence at the conclusion of their criminal sentences.[5] California's SVPA has a dual purpose: first, to remove dangerous SVPs from society and second, to provide them with treatment. The SVPA procedures and confinement are civil in nature rather than criminal and punitive. *People v. Superior Court (Cheek),* 94 Cal.App.4th 980, 987–88, 114 Cal.Rptr.2d 760 (2001) (the SVPA establishes a civil commitment scheme covering persons who are to be viewed not as criminals, but as sick persons; thus, an SVPA proceeding is civil in nature); *Hubbart v. Superior Court,* 19 Cal.4th 1138, 1155, 1179, 81 Cal.Rptr.2d 492, 969 P.2d 584 (1999); *People v. Hubbart,* 88 Cal.App.4th 1202, 106 Cal.Rptr.2d 490 (2001), *reh. den., rev. den., cert. den.,* —— U.S. ——, 122 S.Ct. 1097, 151 L.Ed.2d 994 (2002). The United States Supreme Court has upheld SVP statutes against constitutionality challenges. *See, e.g., Kansas v. Hendricks,* 521 U.S. 346,

**5.** An uncodified statement of legislative intent accompanying California's SVPA reads in full: "The Legislature finds and declares that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders can be identified while they are incarcerated. These persons are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. The Legislature further finds and declares that it is in the interest of society to identify these individuals prior to the expiration of their terms of imprisonment. It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society. ¶ The Legislature further finds and declares that while these individuals have been duly punished for their criminal acts, they are, if adjudicated sexually violent predators, a continuing threat to society. The continuing danger posed by these individuals and the continuing basis for their judicial commitment is a currently diagnosed mental disorder which predisposes them to engage in sexually violent criminal behavior. It is the intent of the Legislature that these individuals be committed and treated for their disorders only as long as the disorders persist and not for any punitive purpose." Stats. 1995, ch. 763 § 1; *see also Statement of Legislative Intent: Hearing on Assemb. B. 888 Before the S. Rules Comm.,* 1995–96 Leg., 9/12/95 (Cal.1995).

117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (construing and upholding a Kansas SVPA statutory scheme similar to California's and enacted one year before)[6]; *Seling v. Young*, 531 U.S. 250, 259–60, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (construing and upholding as a civil rather than punitive process Washington's SVP statutory scheme, which is similar to Kansas' and California's[7], and permitting the confinement of SVPs at segregated centers located within the perimeter of a Department of Corrections facility).

SVPs present different societal problems than disordered persons who may fall within other statutory schemes providing for civil confinement. "The sexually violent predator law recognizes that persons under its jurisdiction are behavior problems and are not recognized as either mentally ill or treatable by traditional modalities." *Hearing on Assemb. B. 3130 Before the S. Comm. on Crim. Procedure, Key Issues and Comments, Placement of Sexually Violent Predators*, 1995–96 Leg., Reg. Sess., 7/9/96 (*"Placement of Sexually Violent Predators"*). The objective of California's SVPA provisions is "to allow the state a means to place and treat sexually violent predators in a secure mental facility following their release from prison." *Hearing on Assemb. B. 888, Assemb. Comm. on Public Safety Digest*, 1995 Leg., 4/18/95, p. 5 (*"Assemb. Comm. on Public*

*Safety Digest"*). "[T]he overall purposes of the [SVPA] are to protect the public from a select group of offenders who are extremely dangerous and to provide treatment for them." *People v. Preciado*, 87 Cal.App.4th 1122, 1130–31, 105 Cal.Rptr.2d 159 (2001), citing *Hubbart*, 19 Cal.4th at 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584; *People v. Ward*, 97 Cal.App.4th 631, 118 Cal.Rptr.2d 599 (2002).

The "Background" discussion before the Assembly Committee on Public Safety expressly distinguished the SVPA from other statutory schemes for the commitment of mentally disordered and dangerous persons to involuntary mental health care, such as the Mentally Disordered Offender ("MDO") law and the civil commitment system established by the Lanterman Petris Short Act ("LPS") referenced by Munoz. In particular:

> Many sexual predators, however, do not have a major mental disorder and are therefore not eligible for the Mentally Disordered Offender Program ["MDO"]. They typically are neither found incompetent to stand trial nor not guilty by reason of insanity. Further, they are not appropriate for the civil commitment system established by the [LPS] Act. ¶ California previously had a Mentally Disordered Sex Offender (MDSO) law in which people convicted of sex crimes could be diverted from prison to mental

---

**6.** "Although the civil commitment scheme at issue here does involve affirmative restraint, 'the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment.' [Citation omitted]. The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded. The Court has, in fact, cited the confinement of 'mentally unstable individuals who present a danger to the public' as a classic example of nonpunitive detention. If detention for the purpose of protecting the community from harm *necessarily*

constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072 (citations omitted).

**7.** The AB 888 (Rogan) bill, which became California's SVPA, "is loosely patterned after Washington and Minnesota statutes." *Should Specified Sexual Offenders Who Have Completed Their Determinate Sentences Be Subject To Civil Commitments?: Hearing on Assemb. B. 888 Before the S. Comm. on Crim. Procedure*, 1995–96 Leg., Reg. Sess., 5/31/95, p. 5.

health facilities for treatment if they were found to be predisposed to such crimes by "reason of mental defect, disease or disorder." ... The law was repealed in 1982, largely as a result of the perception that the treatment was ineffective and that it allowed offenders to avoid prison.

*Assemb. Comm. on Public Safety Digest, supra,* pp. 6–7. In contrast:

The current proposal for civil commitment of sexually violent predators differs significantly from the MDSO commitment. Most importantly, the proposed [SVPA] commitment would not divert offenders from prison terms, but would take effect at the end of their prison terms. Also, the [SVPA] proposal is intended for a much smaller group of offenders, those who are considered predatory and dangerous. **A related difference is the fact that, unlike MDSO, the current proposal's commitment criteria involve the offender's dangerousness, not his amenability to treatment.**

*Id.,* p. 7 (emphasis added).

The California legislative scheme thus establishes the SVPA as distinguishable from other involuntary confinement statutes, and SVPs as not similarly situated to persons within the other classes. Consequently, Equal Protection issues that may arise under one of those statutes do not necessarily arise under the others. SVPs do not necessarily have a right to the same treatment afforded other classes of persons who face confinement in mental health facilities. *See Hubbart,* 19 Cal.4th 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584; *People v. Poe,* 74 Cal.App.4th 826, 833, 88 Cal.Rptr.2d 437 (1999) (distinguishing between the mentally ill and sexual predators has a rational relationship to a legitimate government interest); *Hubbart,* 88 Cal. App.4th at 1221, 106 Cal.Rptr.2d 490 (finding no equal protection violation and rejecting an SVP's contention that the SVPA violates equal protection by failing to provide for treatment prior to commencement of long-term commitment: "persons committed under the SVPA are not similarly situated to persons committed under the MDO law or LPS Act").[8] Even though confinement under SVP statutes is civil rather than criminal or punitive, the compelling state interest underlying the SVPA is to protect society, not merely to attempt to treat SVPs.

The SVPA was amended in pertinent part in 1996 and 1998 to change the custody and confinement relationship between the SVP and the custodial entity as well as the designated confinement facility. Until the 1996 amendments, SVPs were required to be housed in facilities controlled by the Department of Corrections. As originally enacted, "[t]he inmate [following court hearing determining the person to be a SVP] would be housed within the CDC but is under the jurisdiction and treatment of the Department of Mental Health." *Bill Summary: Hearing on Assemb. B. 888*

---

**8.** "The fact that involuntary confinement under the MDO law is directly related to the crime for which the defendant was incarcerated distinguishes SVPs from MDOs. Moreover, the MDO law targets people with severe mental disorders that may be kept in remission with treatment (Pen.Code § 2962, subd. (a)), whereas the SVPA targets persons with mental disorders that may never be successfully treated (Welf. & Inst.Code, § 6606, subd. (b)). Given these contrasting backgrounds and expectations related to treatment, we cannot say the two groups are similarly situated in this respect for equal protection purposes. The LPS Act, in contrast to the SVPA, does not require that the person be serving a prison term at the time of evaluation for commitment. For this reason, persons committed under those two acts are not similarly situated on the issue of comparative treatment while in prison." *Hubbart,* 88 Cal.App.4th at 1222, 106 Cal.Rptr.2d 490 (citations omitted).

*Before the Appropriations Comm. Fiscal Summary*, 1995 Leg., 9/11/95. The 1996 amendments, among other things, "eliminate[d] that requirement, tacitly authorizing placement in facilities operated by the DMH [Department of Mental Health]." *Placement of Sexually Violent Predators, supra.* "The bill would eliminate the current requirement that sexually violent predators be held in prison facilities." *Should a Number of Modifications to the Sexually Violent Predatory Law Be Made?: Hearing on Assemb. B. 3130 Before the S. Comm. on Crim. Procedure, Key Issues*, 1995–96 Leg., Reg. Sess., 6/18/96.

### 2. *SVPA Commitment Procedures*

California's SVPA establishes procedures to safeguard the due process rights of the affected persons. It provides a process for the civil commitment of sexually violent predators, generally defined as persons who have received a determinate prison sentence for conviction of a sexually violent offense against multiple victims and who have been diagnosed with a mental disorder that makes the person a danger to the health and safety of others due to the likelihood of renewed sexually violent criminal behavior. WELF. & INST.CODE § 6600(a).

When the Director of Corrections determines an individual who is in custody under the jurisdiction of the CDC, and who is either serving a determinate prison sentence or whose parole has been revoked, may be a SVP, the director is required to refer the person to the DMH for evaluation prior to the individual's scheduled release date. WELF. & INST.CODE § 6601. If the DMH evaluation concludes the inmate should remain confined as a SVP, a Superior Court judge reviews the petition and determines "whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release" from criminal custody. WELF. & INST.CODE § 6602(a). If so, a probable cause hearing is held. *Id.* "Upon commencement of the probable cause hearing, the person **shall remain in custody** pending the completion of the probable cause hearing." *Id.* (emphasis added).

If the judge determines there is not probable cause, he or she shall dismiss the petition and any person subject to parole shall report to parole. **If the judge determines there is probable cause, the judge shall order that the person remain *in custody in a secure facility* until a trial is completed** and shall order that a trial be conducted to determine whether the person is, by reason of a diagnosed mental disorder, *a danger to the health and safety of others* in that the person is likely to engage in acts of sexual violence **upon his or her release from the jurisdiction of the Department of Corrections or other secure facility.**[9]

WELF. & INST.CODE § 6602(a) (emphasis added).

After a finding of probable cause, the alleged SVP is entitled to a jury trial for determination beyond a reasonable doubt that the person is a SVP. WELF. & INST. CODE §§ 6603, 6604. Civil commitment at the conclusion of service of the criminal sentence follows a determination that the person is a SVP.

---

**9.** "Secure facility" is not separately defined in the statute. *See* WELF. & INST.CODE § 6600. A 1997 amendment to Section 6600.05 particularized the meaning of "secure facility for mental health treatment": "Atascadero State Hospital shall be used whenever a person is committed to a secure facility for mental health treatment pursuant to Section 6600 and is placed in a state hospital under the direction of the State Department of Mental Health unless there are unique circumstances that would preclude the placement of a person at that facility. . . ."

If the court or jury determines that the person is a sexually violent predator, the person shall be committed for two years **to the custody of the State Department of Mental Health** for appropriate treatment and **confinement in a secure facility designated by the Director of Mental Health,** and the person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a petition for extended commitment. . . .

WELF. & INST.CODE § 6604.

The SVPA does not specify when the commitment process must be completed.[10] *People v. Talhelm,* 85 Cal.App.4th 400, 407, 102 Cal.Rptr.2d 150 (2000) ("we have carefully reviewed the legislative history of the SVP Act. We have found absolutely no indication that the Legislature intended the commitment proceedings to be completed before the defendant's scheduled release date"); *Preciado,* 87 Cal.App.4th at 1127, 105 Cal.Rptr.2d 159 ("[O]nce a [SVPA] petition is filed, there is no additional limit on time in which the allegations of the petition must be tried"); *see People v. Ward,* 71 Cal.App.4th 368, 83 Cal. Rptr.2d 828 (1999) (sex offender who re-

ceived a two-year civil commitment as a sexually violent predator was not entitled to credit against that term of commitment for the 231 days he was in jail before the jury made its findings).

The committed SVP may petition for review of that status and for conditional release after one year of the two-year commitment period.[11] WELF. & INST.CODE §§ 6603, *et seq.* Such a review is subject to the same due process safeguards as for initial commitment and recommitments. WELF. & INST.CODE § 6605.

The SVPA allows a person adjudicated a sexually violent predator to be confined for additional two-year periods beyond the initial two-year confinement, in accordance with procedures comparable to those required for the initial commitment. WELF. & INST.CODE § 6604; *Ward,* 97 Cal.App.4th 631, 118 Cal.Rptr.2d 599. The two-year commitment process "may be repeated every two years without limit." *Sen. Comm. on Crim. Procedure, Issues Statement re Assemb. B. 3130,* pp. 2–3, as amended 5/24/96.

### C. *Statute Of Limitations*

The statute of limitations for bringing a 42 U.S.C. § 1983 claim is determined by

---

**10.** "Section 6601.3 states that the defendant's commitment for evaluation shall be limited to 45 days unless the defendant's scheduled release date is later than 45 days from the time of the referral. Under this provision, a potential sexually violent predator might conceivably be confined beyond his or her scheduled release date from prison for up to 45 days. This provision is evidence of legislative intent to allow the commitment proceedings to last beyond the date of the defendant's scheduled release from prison." *People v. Talhelm,* 85 Cal.App.4th 400, 406–407, 102 Cal.Rptr.2d 150 (2000).

**11.** The SVPA provides that a person found to be a sexually violent predator and committed to the State Department of Mental Health must have an examination of his or her cur-

rent mental condition at least once per year. WELF. & INST.CODE § 6605(a). The person has a right to petition the court for conditional release. If the person does not affirmatively waive that right, "the court shall set a show cause hearing to determine whether facts exist that warrant a hearing on whether the person's condition has so changed that he or she would not be a danger to the health and safety of others if discharged." WELF. & INST. CODE § 6605(b). If such a change appears from the show cause hearing, the court sets a hearing on that issue. WELF. & INST.CODE § 6605(c). If not, the person resumes the term of commitment previously adjudicated. The July 29, 1999 through November 11, 1999 period Munoz spent in County Jail appears to have been in connection with a request for that process. *See* Section I.A above.

state law governing personal injury claims. *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). "Section 1983 and most related federal civil rights statutes have no independent statute of limitations. Instead, the applicable limitation period is determined by borrowing the forum state's limitation period, including its tolling provisions, for the most analogous personal injuries.... In California, the limitation period is one year." *Ellis v. City of San Diego,* 176 F.3d 1183, 1188–1189 (9th Cir.1999); *see also Knox v. Davis,* 260 F.3d 1009, 1012–13 (9th Cir. 2001).

Munoz filed his Complaint on November 20, 2000. Defendant summarily concludes: "Munoz' complaint is time-barred with respect to the first three periods of incarceration [ending November 11, 1999] because the complaint was filed more than one year after the expiration of the alleged illegal incarceration." [12] Mot. 2:6–8, 2:27–28. However, a discrepancy appears from the Motion and Opposition papers with respect to the conclusion of Munoz's criminal sentences. Defendant relies on the Superior Court's notation in its April 22, 1998 minute order that Munoz's state prison commitment ended March 27, 1998. That order on its face pertains only to Case No. CR 104403, his six-year sentence. Munoz was also serving the concurrent eleven-year sentence in Case No. CR 132597.

Munoz asserts his "CDC term of prison sentenced [*sic*] and parole term has expired on March 16, 2001." Opp. 2:7–8. He does not explain how he arrives at that date. He associates no case number with that representation, nor does he identify what portion of the term he contends was for service of "sentence" and what portion would have been "parole," presumably had he not been detained as a SVP.[13] Although the SVPA provides that the period of SVP confinement begins at the conclusion of the SVPs criminal sentence, Munoz had received only 369 days of custody credit at the time of his sentencing in Case No. CR 132597. He may still have been serving some portion of that eleven-year criminal sentence concurrently with his SVP commitment following the conclusion of his six-year criminal sentence in Case No. CR 104403. No evidence in the record shows Munoz's conviction or sentence in Case No. CR 132597 was ever reversed or invalidated. Such a circumstance could affect the statute of limitations if Munoz was not in fact solely a civil detainee in County Jail at all relevant times.

The text of Opposition Exhibit "G", a County Jail Administrative Segregation Order, contributes to the ambiguity. That Exhibit records that on April 6, 1998, Munoz requested and was granted placement in protective custody "until classification" [14] because he had received threats

**12.** Munoz argues that he will be "subject to the [SVPA] statute every one to two years and will be transport[ed] back to the County of San Diego pursuant to (W.I.C.6602)," asserting an exception to the statute of limitations should apply because the nature of the conduct he complains of will be recurring and "the challenged action in its duration is too short to be fully litigated prior to cessation or expiration." Opp. 6:27–7:1; *see also* Opp. 1:9–11. The court finds it need not reach that argument.

**13.** Periods of actual parole do not count towards the disability period provided for in the tolling statute. Munoz appears never to have

been actually paroled either in Case No. CR 104403 or in Case No. 132597 after his probation in CR 104403 was revoked in December 1992 concurrently with his plea in CR 132597.

**14.** The allusion to "classification" apparently refers to institutional evaluation for purposes of determining whether Munoz should remain at GBDF [George Bailey Detention Facility] until "Munoz's package" could be reviewed, with "possibl[e] transfer" to CDF (presumed to be Central Detention Facility). One possible inference from that document is that his County Jail detention in connection with his first SVP classification, pursuant to the SVPA,

from other inmates. Munoz characterized himself at that time as an "inmate" who "had just returned from prison", and "wanted to take care of this case *and go back [to prison]* without any problem." That notation raises the inference he had time remaining to serve on a criminal sentence. Defendant has not established the date of completion of Munoz's entire prison sentence. The court cannot make any determination as a matter of law on the record presented. Defendant's supplemental briefing provided no help to resolve these questions.

The issue is material because California recognizes a tolling period for incarcerated prisoners. If a person entitled to bring an action "is, at the time the cause of action accrued, **imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life,** the term of that disability is not a part of the time limited for the commencement of the action, **not to exceed two years.**" CAL.CODE CIV. P. § 352.1(a) (emphasis added); *see Ellis,* 176 F.3d 1183 (applicable limitations period for arrestee's federal civil rights claims was tolled as result of his incarceration; therefore, action brought within one year from arrestee's release date was timely filed). The tolling provision applies only to "an action to recover damages or that portion of an action that is for the recovery of damages, relating to the conditions of confinement, including an action brought by that person pursuant to Section 1983 of Title 42 of the United States Code." CAL. CODE CIV. P. § 352.1(c). In addition to an injunction, Munoz seeks damages related to the conditions of his County Jail confinement.

■ Neither side raises the potential application of the statutory tolling provision on the timeliness of Munoz's claims

occurred before he had completed serving the

nor briefs the issue. An issue of material fact appears from the evidence presented that precludes summary adjudication for Defendant on grounds the action is time-barred with respect to the first three periods of County Jail confinement Munoz challenges. The court may grant a motion to dismiss a plaintiff's complaint on statute of limitations grounds only if the allegations in the complaint, construed with the requisite liberality, would not permit the plaintiff to prove that the statute was tolled. *Cervantes v. City of San Diego,* 5 F.3d 1273, 1275 (9th Cir.1993) (citing *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980)). For all the reasons outlined above, the court is unable to conclude on this record, as a matter of law, that any period of Munoz's claims alleged in the Complaint is necessarily barred by the statute of limitations.

**D.** *County Jail Detention Pending SVPA Proceedings*

**1.** *Equal Protection*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted); *see also Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the express terms of a statute or by its improper execution through duly constituted agents." *Sioux*

longer of his concurrent criminal sentences.

*City Bridge Co. v. Dakota County,* 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923) (citations omitted); *see also Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

To the extent Munoz's Equal Protection claim relies on authority or comparison with persons confined under other of California's civil commitment schemes, such as the MDO or the LPS, his demonstration fails. SVPs are not "similarly situated" for Equal Protection purposes to persons committed under the other schemes. *See* Section II.B.1, above. The rights of classes of civil detainees other than those committed under the SVPA create no rights not provided in the SVPA. "Each of those acts [ (the [LPS] Act, the MDO Act, and the SVPA)] applies to a precisely defined category of individuals, prescribes a detailed sequence of evaluations and procedures that must be followed, [although all] afford[ ] the affected individuals mandatory procedural safeguards, including the right to a jury trial, before civil commitment can occur." *Hubbart,* 88 Cal.App.4th at 1227, 106 Cal.Rptr.2d 490.

### 2. *Gravamen Of Munoz's Equal Protection Claim*

Defendant correctly notes the constitutionality of sexually violent predator statutes comparable to California's have been upheld by the United States Supreme Court against Equal Protection and other constitutional challenges. *See, e.g., Hendricks,* 521 U.S. 346, 117 S.Ct. 2072; *Selling,* 531 U.S. 250, 121 S.Ct. 727. However, contrary to Defendant's emphasis in his Motion papers, the court does not construe Munoz's Complaint or Opposition as an attack on the constitutionality of the SVPA or on his classification and treatment as a SVP. Munoz does not challenge the process or duration of his SVP adjudication. Rather, he *relies on* the SVPA to contend that his transfers from Atascadero for detention in County Jail in connection with his SVP adjudication proceedings deprived him, and will in the future deprive him, of his alleged right to be detained at all times in a state mental health facility. Accordingly, Defendant's arguments in defense of the statute itself are beside the point.

Despite complaints of conditions of confinement depriving him of "equal protection," [15] the narrow gist of Munoz's Equal Protection claim is that any detention in County Jail constitutes a penal commitment of a civil detainee and violates WELF. & INST.CODE §§ 6600 *et seq.* providing for the housing of SVPs in secure mental health facilities. Compl. pp. 2–3. In particular:

> Petitioner should never have been placed in the San Diego County Jail as California State Law provides for all civil type commitments, placement in the nearest to the controlling Court, mental health facility so as to provide for treatment of patient.

Compl. p. 4.

The exact nature of his Equal Protection claim is reinforced by the injunctive relief he seeks:

---

**15.** "[G]uaranteed rights of petitioner" Munoz alleges in his Count Two equal protection claim Defendant deprived him of, "us[ing] California State Code of Regulations Title 15 section 1067, and California State Penal Code Section 851.1," are "usage of telephone, clothing, access to outdoors, and many other [unspecified] rights outlined in California state law." Compl. p. 5. Title 15 section 1067 provides, in its entirety: "The facility admin-istrator shall develop written policies and procedures which allow reasonable access to a telephone beyond those telephone calls which are required by Section 851.5 of the Penal Code." The latter section provides that certain free telephone calls shall be permitted "arrested persons" immediately. Neither section appears to apply to Munoz's circumstances, nor to support any constitutional claim in these circumstances.

That the honorable Court issue permanent injunction to stop defendant from housing petitioner Munoz at the San Diego County Jail with the stipulation *that petitioner Munoz will be transported to and from each court hearing in San Diego via County transportation departing from and returning to the Atascadero State Hospital each and every day that petitioner is required to appear in court.*[16]

Compl. p. 6, Prayer para. 2 (emphasis added).

Munoz elaborates his Equal Protection claim in terms of conditions of confinement which ignore "the difference between what the State of California calls an inmate and what the said State calls a Civil detainee...."[17] Compl. p. 4.

### 3. *Propriety Of Detaining Munoz In County Jail Pending SVP Judicial Proceedings*

Munoz is completing the second of his two, two-year confinement periods following his adjudications as a SVP in 1998 and 2000, and he anticipates he will be subject to new SVP proceedings on July 30, 2002. Opp. 1:2–6. He maintains he should not be transferred from Atascadero for detention in County Jail during periods of court proceedings related to adjudication of his SVP status. Compl. p. 4.

The SVPA does not expressly authorize the temporary housing in County Jail of persons subject to SVP judicial proceedings during the course of those proceedings. The parties have identified no dispositive authority on the issue whether federal constitutional protections may be violated by the custody transfer, and the court has found none. In fact this issue appears still to be working its way though the state courts.[18]

The SVPA initially provided that SVPs be housed in prison facilities. Later revisions instead provided for SVPs to be placed in a facility designated by the Director of Mental Health, in particular at Atascadero, rather than a facility under the jurisdiction of the CDC. *See* Section II.B above. Such placement, however, need not occur "until there has been a determination pursuant to Section 6601.3 or 6602 that there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior." Welf. & Inst.Code § 6602.5.

The use of the undefined terms "secure facility" and "custody" in the various provisions of the SVPA, as well as the logistical realities associated with the entitlement of SVPs to due process such as their presence at probable cause hearings and trial, permit the inference that the term is not consistently used to mean a mental health facility. For example, Section 6601.5, describing the court's probable cause determination process, provides in pertinent part (emphasis added): "If the judge determines that the petition, on its face, supports a finding of probable cause, the judge shall order that the person *be de-*

---

**16.** The court notes the logistical absurdity of the result Munoz urges, a round trip of several hundred miles daily for court appearances.

**17.** Munoz alleges he "requested the Courts send him back to the Atascadero State Hospital forthwith, in order to be relieved of the penal treatment petitioner was in fact receiving [in County Jail]." Compl. p. 4. To the extent he suggests the state court acted in violation of the SVPA, violation of state law standing alone is inadequate to state a 42 U.S.C. § 1983 claim. *See, e.g., Gibson,* 781 F.2d at 1338.

**18.** *See, e.g., Los Angeles Times, Orange County Edition,* May 13, 2002, B1, "Sex Offenders Sue Over Jail Time." The article describes pending constitutional challenges filed by repeat sex offenders of transfers to Los Angeles County jails while their SVP trials are pending.

*tained in a secure facility* until a hearing can be completed pursuant to Section 6602." The judge in Munoz's case expressly ordered custody transferred to Sheriff Kolender for judicial proceedings availability. "Upon the commencement of the probable cause hearing, the person *shall remain in custody* pending completion of the probable cause hearing.... If the judge determines that there is probable cause, the judge shall order that the person *remain in custody in a secure facility* until a trial is completed ... to determine whether the person is ... a danger to the health and safety of others upon his or her release from the jurisdiction of the Department of Corrections *or other secure facility.*" Section 6602(a) (emphasis added). "Until a permanent housing and treatment facility is available, Atascadero State Hospital shall be used whenever a person *is committed to a secure facility for mental health treatment* pursuant to this article...." Section 6600.05(a) (emphasis added). Although the "commitment" of an SVP may now only be to a mental health facility, the state Legislature did not forbid temporary housing for purposes of judicial proceedings related to the commitment determination in some other "secure facility."[19] *See Ward,* 71 Cal.App.4th at 376, 83 Cal. Rptr.2d 828.

The United States Supreme Court has upheld the constitutionality of housing individuals who have been adjudicated SVPs within prison facilities, in segregated housing. *See Seling,* 531 U.S. at 261, 121 S.Ct. 727 (discussing *Hendricks,* 521 U.S. 346, 117 S.Ct. 2072 (construing and upholding Kansas' SVPA)). The *Seling* and *Hendricks* courts concluded Acts permitting segregated confinement in such "secure facilities" were appropriate and non-punitive because the persons confined were dangerous to the community. *Seling,* 531 U.S. at 261, 121 S.Ct. 727.

In addition, the SVPA requires that proceedings occur in the county of conviction or where the underlying offense occurred.[20] A reasonable inference is that the statutory scheme contemplates displacement of SVPs from Atascadero to "secure facilities" in proximity to the venue of the judicial proceedings, with attendant temporary custody transfers. To be "secure," a facility plainly must provide for the guarding and escorting of individuals in detention there. The civil detention of SVPs at the conclusion of their criminal sentences arises from their dangerousness to others. In that light, the appropriateness of County Jail for their temporary confinement pending judicial proceedings is supported by such considerations as that facility's proximity to court, the availability of officers to transport the person to court appearances, and the like. No controlling authority has been identified that requires or prohibits Munoz's temporary detentions in County Jail incident to the conduct of his SVP proceedings. Absent such a pro-

---

19. "The two-year term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section. The two-year term shall not be reduced by *any time spent in a secure facility* prior to the order of commitment." (WELF & INST.CODE § 6604.1(a)); *see Ward,* 71 Cal. App.4th at 376, 83 Cal.Rptr.2d 828 (emphasis added).

20. "If the county's designated counsel concurs with the [State Department of Mental Health] recommendation [that a petition for SVP commitment be filed], a petition for commitment shall be filed in the superior court of the county in which the person was convicted of the offense for which he or she was committed to the jurisdiction of the Department of Corrections. *The petition shall be filed, and the proceedings shall be handled, by either the district attorney or the county counsel of that county.*" WELF & INST CODE §§ 6601(i), 6602(a) (emphasis added).

hibition, the court has considered the reasons SVPs are prevented from reentering society, as well as the precaution of segregated placement policies within the temporary detention facilities for the protection of those individuals. This court concludes the need to safely produce dangerous detainees for judicial proceedings and associated logistical challenges support the use of local law enforcement detention facilities for that purpose and do not run afoul of any constitutional right Munoz has identified.

In support of his opposition, Munoz provides the text of Chapter 248, Assembly Bill No. 659, enacted in 2001, "An act to amend Sections 1610 and 4002 of the Penal Code, relating to inmates" ("Bill"). Opp. Ex. "D". The Bill does not constitute evidence material to this summary judgment determination.[21] Moreover, the court notes the Assembly Bill actually presumes that "inmates classified as sexually violent predators" will at times be housed in "jail" and provides those persons are to be "administratively segregated in jail." Contrary to the inference Munoz urges, the Bill's plain language actually supports the propriety of housing persons detained for SVP proceedings in facilities such as County Jail while their status adjudications are pending.[22]

### 4. Duration Of County Jail Detention

Munoz's verified Complaint alleges he was transported from Atascadero and "illegally held" in the San Diego County Jail while awaiting SVP court proceedings for the periods: February 16, 1998 through May 14, 1998; July 24, 1998 through September 10, 1998; July 29, 1999 through November 11, 1999; and April 20, 2000 through August 14, 2000.[23] Compl. p. 6;

---

**21.** Other of Munoz's "evidence" is similarly immaterial to the summary judgment determination. In particular, his Exhibit "F" purporting to be Declarations from ten individuals describing in identical language certain conditions of confinement in San Diego County Jail lack foundation and, even if the individuals were similarly situated to Munoz, their complaints do not support his claim he is receiving disparate treatment.

**22.** The Legislative Counsel's Digest notes in that Exhibit provide in pertinent part: "This bill would, in addition, require inmates classified as sexually violent predators to be administratively segregated **in jail** ..." Opp. Ex. "D". The Bill appears to expressly contemplate SVPs legitimately may be confined at times in correctional facilities rather than mental health facilities. In addition, the Bill provides continuation of treatment during those periods is required only "to the extent possible." Opp. Ex. "D", p. 3 (emphasis added).

**23.** The court adopts those dates as the periods challenged in the Complaint because they are substantiated by exhibits provided by the parties, despite discrepancies in Munoz's references elsewhere to the exact begin and end dates. Munoz states these periods of confinement total "534 days spent in County Jail," whereas the court's calculation sets the actual number of elapsed days in County Jail based on the date ranges alleged at 326 days. Compl. ¶ 1; p. 4; p. 6, Item 3. However, this discrepancy has no practical effect on the outcome here. Detention periods pending SVP adjudication do not affect the duration of the SVP commitment period. "Custody credits" are not accumulated. Considerably longer periods in custody pending the outcome of such proceedings have been upheld. See, e.g. Hubbart, 88 Cal.App.4th at 1224–25, 106 Cal.Rptr.2d 490 (sex offender spent over four years in custody before being found a sexually violent predator; fact that some sexually violent predators would remain in custody longer than others was justified by state's compelling interest in ensuring such persons received maximum term of two years of treatment, and by the need to protect the public). The two-year commitment term commences "on the date upon which the court issues the initial order of commitment" and "shall not be reduced by any time spent in a secure facility prior to the order of commitment. WELF. & INST.CODE § 6604.1(a). For any subsequent extended commitments, the term of commitment shall be for two years commencing from the date of the termination

Opp. 4:10–15. He maintains he was a civil detainee on each of those occasions, and was wrongfully, "treated as a penal commitment while housed in this penal facility." Compl. pp. 1–2. The court finds his Complaint attacks the fact and conditions of County Jail detention pending SVP proceedings irrespective of its duration.

With respect to the only period briefed in the Motion, Defendant contends that he acted in compliance with court orders to hold Munoz in a "secure facility" until trial, that Munoz's detention in County Jail was not punitive or excessive, and summarily concludes: "Munoz was detained for the period of time necessary to afford him a jury trial on the issue[ ] of continued detention" under the SVPA. Mot. pp. 3–4, 6:12–15. Presumably, Defendant would adopt that contention as to all the periods alleged in the Complaint had he fully briefed the Motion.

However, portions of the record could raise an issue whether the duration of Munoz's confinement at County Jail was in fact entirely justified. For example, the Superior Court's March 30, 1998 Order remanded Munoz to the custody of the Sheriff, "without bail, to be retained at County Mental Health[ 24] until such time as *the Sheriff shall transport the defendant to Atascadero State Hospital at the Sheriff's earliest convenience.*" Opp. Ex. "B" (emphasis added). His next court appearance occurred on April 22, 1998. It does not appear that Munoz was actually transferred during the interim. The record reflects Munoz was transferred to Atascadero on May 14, 1998, following the

court's April 22, 1998 Order. Opp. Ex. "C". Although the propriety of the entire duration of County Jail confinement for each of the periods alleged in the Complaint is accordingly not clear from the record presented, Munoz's legal claim is that *no* County Jail confinement of an SVP or potential SVP of any duration is permissible. For the reasons set forth above, the court finds otherwise.

### E. *Munoz Fails To State A Cruel And Unusual Punishment Or Substantive Due Process Claim*

In Count One, Munoz alleges cruel and unusual punishment in violation of the Eighth Amendment on grounds of purported "illegal" incarceration in the County Jail and infliction of "penal conditions" during civil commitment. Compl. pp. 2–3. He alleges Defendant exhibited "deliberate indifference" to the distinction between Munoz's status as a civil detainee and criminal detainees in the County Jail, "forc[ing] petitioner to withstand penal conditions for the entire time petitioner was incarcerated illegally at the San Diego County Jail," "without the benefit of any of the guaranteed rights established for civil detainees in accordance with California's own State Laws and regulations." Compl. p. 3. Munoz variously characterizes his Eighth Amendment contentions, first as an attack on his treatment while in County Jail and second, as an attack on the fact of his placement there at all. Compl. p. 2.

Eighth Amendment scrutiny applies to claims of cruel and unusual punishment regarding conditions of confinement asserted by convicted prisoners.[25] "Where

---

of the previous commitment...." WELF. & INST.CODE § 6604.1(b).

**24.** The significance of the reference to County Mental Health with respect to Munoz's claims is not addressed in the papers.

**25.** "The Cruel and Unusual Punishments Clause 'was designed to protect those convict-

ed of crimes,' and consequently the Clause applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions' (Citations omitted). An express intent to inflict unnecessary pain is not required, *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ('deliberate indifference' to a prisoner's serious medical needs is cruel

the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671–672, n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). *Id.* Munoz's criminal status at all times alleged in the Complaint is not entirely clear. *See* Section I.A above.

Conditions of confinement claims raised by detainees who are not adjudicated criminals are analyzed under the Fourteenth Amendment substantive Due Process Clause, rather than under the Eighth Amendment. *Bell,* 441 U.S. at 535 n. 16, 99 S.Ct. 1861; *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir.1998). Nevertheless, comparable standards apply to both prisoners' Eighth Amendment cruel and unusual punishment and Fourteenth Amendment substantive due process analyses, with Fourteenth Amendment analysis borrowing from Eighth Amendment standards. *Frost,* 152 F.3d at 1128; *Redman v. County of San Diego,* 942 F.2d 1435, 1440–41 (9th Cir.1991); *Carnell v. Grimm,* 74 F.3d 977, 979 (9th Cir.1996). The SVPA implicates substantive due process

issues because it affects substantial liberty interests by allowing the continued detention of a defendant who has served his underlying prison term and was scheduled to be released from custody.

To prevail on this claim, Munoz must establish that the restrictions imposed by his confinement in County Jail were punishment rather than incident to legitimate government purposes, as determined by an assessment of whether the restriction appears excessive in relation to the purpose. *Bell,* 441 U.S. at 538, 99 S.Ct. 1861. To sustain a cruel and unusual punishment claim regarding conditions of confinement, a claimant must allege facts sufficient to fulfill both an objective and a subjective requirement. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Allen v. Sakai,* 48 F.3d 1082, 1087 (9th Cir.1994). Under the objective requirement, the plaintiff must allege facts sufficient to show that the prison official's acts or omissions deprived·the plaintiff of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Wilson v. Seiter,* 501 U.S. 294, 298–300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). This objective component is not satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982); *see Farmer,* 511 U.S. at 832, 114 S.Ct. 1970; *Wright v. Rushen,* 642 F.2d 1129, 1132–33 (9th Cir.1981).

and unusual punishment), and harsh 'conditions of confinement' may constitute cruel and unusual punishment unless such conditions 'are part of the penalty that criminal offenders pay for their offenses against society.' (Citation omitted). Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. 'After incar-

ceration, only the " 'unnecessary and wanton infliction of pain' " ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' *Ingraham v. Wright,* 430 U.S. [651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711, (1977) ] (quoting *Estelle v. Gamble, supra,* 429 U.S., at 103, 97 S.Ct., at 290) (citations omitted)." *Whitley,* 475 U.S. at 318–19, 106 S.Ct. 1078.

The subjective component necessary to establish liability for cruel and unusual punishment requires, as a threshold matter, the existence of an actionable deprivation, as to which the defendant purportedly acted with "deliberate indifference." *Wilson,* 501 U.S. at 303, 111 S.Ct. 2321; *Allen,* 48 F.3d at 1087; *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

■ "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoners' interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Absent a deprivation objectively serious enough to implicate his constitutional rights, Munoz cannot prevail on a cruel and unusual punishment claim. The state of mind required for an official to be culpable under 42 U.S.C. § 1983 is "deliberate indifference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Mere negligence is insufficient to sustain a claim. *Id.* The court finds Munoz has not designated specific facts showing there is a genuine issue for trial on this claim.

First, with respect to the conditions of his confinement in County Jail while awaiting SVP proceedings, he alleges conditions that constitute "deliberate indifference" and "shock the conscience" include handcuffing while speaking with his lawyer (Compl. p. 2), housing with prisoners, strip searches, poor food, poor condition of clothes, and extended lock downs (Opp. p. 3). Munoz alleges suspension of his right to use the telephone, locked cell time, and

the vaguely alleged infringement of "many other rights," constituting an allegedly "unreasonable burden for civil pretrial detainees." Compl. p. 4. In addition, Munoz attaches to his Opposition as Exhibit "E" an Inmate Grievance form describing an incident in May 2000 involving a random shakedown conducted by a jail deputy who allegedly threw his and others' "confidential legal papers and personal papers" on the floor. Someone's plastic baggie of contraband was apparently mixed with the papers. Munoz complained and was temporarily confined in a holding cell for being disruptive and argumentative.

The court finds as a matter of law the indignities resulting from his confinement in the County Jail of which he complains did not expose Munoz to an excessive risk to his health and safety for any of the periods alleged in his Complaint. Construed in the light most favorable to him, Munoz has identified no condition of confinement rising to the level of a constitutional violation. Necessarily, then, Munoz raises no issue of material fact from which an inference could be drawn that Sheriff Kolender acted with deliberate indifference to such a risk.

■ Second, with respect to Munoz's challenge to the fact of his placement in County Jail, the conditions must amount to punishment in order for him to sustain a Fourteenth Amendment Due Process claim. *Bell,* 441 U.S. at 536, 99 S.Ct. 1861. As discussed above, the detention scheme established by California's SVPA, like that of Washington and Kansas, is a civil process. *See Hendricks,* 521 U.S. 346, 117 S.Ct. 2072. The purpose of Munoz's court-ordered transfers to County Jail was to permit his participation in the judicial process, not to punish him. *See McKune v. Lile,* —— U.S. ——, 122 S.Ct. 2017, 2027, 153 L.Ed.2d 47 (2002) (transfer of prisoner from medium security facility to less-desirable maximum security unit,

when not intended to punish prisoner, "is too ephemeral and insubstantial" to trigger Due Process protections) (quoting *Meachum,* 427 U.S. at 228, 96 S.Ct. 2532). Moreover, an allegation that a state law has been violated is insufficient, without more, to raise a federal constitutional claim cognizable under 42 U.S.C. § 1983. The "right" under the SVPA to be housed at Atascadero rather than in County Jail pending SVP judicial determination proceedings does not involve a federal constitutional right in and of itself, particularly as the United States Supreme Court has upheld confinement of SVPs in prison facilities in segregated confinement. *See, e.g., Hendricks,* 521 U.S. 346, 117 S.Ct. 2072; *see also Talhelm,* 85 Cal.App.4th at 408, n. 5, 102 Cal.Rptr.2d 150; *cf. Olim v. Wakinekona,* 461 U.S. 238, 244–48, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (prisoners have no constitutional right to be housed in any particular institution). This court concludes legitimate purposes are served, without infringing a SVPA detainee's constitutional rights, by the fact of temporary transfer and holding in County Jail. *See* Section II.D.3.

### F. *Munoz's Allegations Fail To State A Claim Against Sheriff Kolender*

#### 1. *Munoz Names No Entity Defendant*

The ambiguous caption of Munoz's Complaint arguably names both Sheriff Kolender and the San Diego County Sheriff's Department. However, in the text of his Complaint, Munoz identifies only Sheriff Kolender as a defendant.[26] He alleges his rights were "violated by the actions of the below named individual." Compl. ¶ 1. He

refers throughout his Complaint to "the named defendant," in the singular. The "Supporting Facts" section of the Complaint recites only conduct by "Defendant, William Kolender, Sheriff." Compl. p. 3.

On December 23, 2000, District Judge Napoleon A. Jones, Jr. granted Munoz's motion to proceed *in forma pauperis.* That Order authorized the U.S. Marshal to "serve a copy of the Complaint and summons upon Defendants as directed by Plaintiff on U.S. Marshal Form 285." Dkt. No. 3, 2:22–23. A letter from the Court to Munoz transmitting the Order also routed "copies" of his complaint, summons, and U.S. Marshal service "forms," and instructed Munoz, among other things: "It is your responsibility to complete the Marshal 285 forms and mail them" to the U.S. Marshal's office, and "[y]ou must provide the U.S. Marshal with a complaint, summons, and Marshal service form *for each defendant to be served.*" Dkt. No. 4. Munoz prepared the summons for service solely on Sheriff Kolender. Dkt. No. 5. No docket entry indicates that Munoz ever instructed the U.S. Marshal to serve any other defendant. More than 120 days have passed since Munoz filed his complaint. *See* Fed.R.Civ.P. 4(m). Without expressing any opinion whether any municipal entity would be a proper defendant, the court finds Sheriff Kolender is the only defendant before the court.

#### 2. *Munoz Fails To State A Claim For Personal Liability Against Sheriff Kolender*

■ Munoz alleges Sheriff Kolender acted "with deliberate indifference in regards to petitioner[']s complaints involving

---

**26.** Paragraph 2 of the Complaint in the "Parties" section provides: "Defendant, William Kolender, Sheriff. Resides or works at the San Diego County Sheriff Department, P.O. Box 2952 San Diego, California 92112–4177, and is employed as Sheriff for the San Diego County Jail, County of San Diego in San Diego, California. This defendant is sued in both his individual and official capacity. The named defendant acted under color of law in that his position provided a vehicle for said defendant to violate the civil and Constitutional rights of petitioner Munoz."

violation of petitioner[']s civil and Constitutional rights, specifically the right to be afforded all rights as a civil pretrial detainee in accordance with California's very own State law." Compl. p. 3. He further alleges Sheriff Kolender violated Munoz's "Constitutional right to remain free from cruel and unusual punishment while acting under color of law, as said defendant did use his individual position to violate petitioners said rights." *Id.* He contends in further conclusory allegations that Sheriff Kolender was "aware of petitioner[']s complaints and refused to take action in correcting his damaging behavior." *Id.* A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978). The causation inquiry must be individualized, focused on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *See Leer v. Murphy,* 844 F.2d 628, 633 (1988); *Berg,* 794 F.2d at 460.

*Respondeat superior* liability does not attach to 42 U.S.C. § 1983 claims. "In a section 1983 action in this circuit, respondeat superior, or vicarious liability, may not be imposed in the absence of a state law imposing such liability." *Redman,* 942 F.2d at 1446 (citation omitted). To avoid the *respondeat superior* bar, Munoz must allege personal acts by Sheriff Kolender which have a direct causal connection to the constitutional violation(s) at issue and provide evidence to support those allegations adequate to avoid summary judgment. *See Sanders v. Kennedy,* 794 F.2d 478, 483 (9th Cir.1986) (such direct connection may be demonstrated by personal participation or direct supervisory responsibility for the policies that person caused to be implemented). "It is well established that Section 1983 does not impose liability upon state officials for the acts of their subordinates under a respondeat superior theory of liability." *Rise v. State of Oregon,* 59 F.3d 1556, 1563 (9th Cir.1995), citing *Monell,* 436 U.S. at 691–94, 98 S.Ct. 2018; *see also Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989); *Palmer v. Sanderson,* 9 F.3d 1433, 1437–38 (9th Cir.1993).

> Nonetheless, our inquiry does not end here. "A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation."

*Redman,* 942 F.2d at 1446–47, quoting *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989); *see also Mackinney v. Nielsen,* 69 F.3d 1002, 1008 (9th Cir.1995).

Supervisory liability "is not a form of vicarious liability. Rather, it is direct liability. To demonstrate supervisory liability, plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.... 'The requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Redman,* 942 F.2d at 1447, quoting *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978). Defendant contends Munoz has not met his burden to "allege[ ] ... facts evidencing conduct on the part of Kolender that would give rise to liability for the actions of unidentified detention facility

staff who were responsible for [Munoz's] incarceration from April 20, 2000 through August 4 [*sic*], 2000," or to "identify any policies, procedures or guidelines established by Kolender that were so deficient they were the primary cause of the alleged constitutional deprivations." Mot. 4:21–28. The court observes the same factual allegation deficiencies exist in the Complaint as to the other three periods of time as well.

Munoz offers no evidence that Sheriff Kolender personally participated in any of the conduct or deprivations he alleges violated his constitutional rights. He asserts that he "made it know[n] **to the Deputy Sheriff's and to the classification board** that Munoz was a[n] involuntary civil commitment and [h]e should not be subject to condition[s] that are punitive in effect. . . ."²⁷ Opp. 8:24–25 (emphasis added). Munoz also alleges Sheriff Kolender "used" certain California Code of Regulations Title 15 and California Penal Code provisions "to suspend guaranteed rights of petitioner involving usage of telephone, locked cell time, and many other rights outlined in California State Law" as "a vehicle to violate petitioner's right to be free from cruel and unusual punishment." Compl. pp. 3–4. Even if the alleged deprivations, supported only by Munoz's legal conclusions, stated a constitutional claim, Munoz does not meet his burden to raise a triable issue regarding Sheriff Kolender's personal participation in any of the conduct challenged in the Complaint. *See Berg*, 794 F.2d at 460. Conclusory allegations of liability are insufficient to withstand a summary judgment motion. *See Vigliotto*, 873 F.2d at 1203.

### 3. *Munoz Fails To State A Claim For Official Capacity Liability*

Neither a state nor state officials acting in their official capacities are "persons" amenable to suit for damages under 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Agencies and subdivisions of a state are similarly not "persons" within the meaning of that statute. *Id.* at 65–66, 109 S.Ct. 2304; *Groten v. State of California*, 251 F.3d 844 (9th Cir.2001). "A suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office." *Id.* at 70, 109 S.Ct. 2304, citing *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). The Eleventh Amendment shields states from suit through an official's office. *Id.*

However, Eleventh Amendment immunity does not extend to municipalities. In certain circumstances, local government officials can be directly sued in their official capacities under 42 U.S.C. § 1983. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (addressing a constitutional challenge to a statute enacted by the city which indisputably was an official policy of the defendant municipality). Local government officials sued in their official capacity are "persons" under 42 U.S.C. § 1983 in those cases where a local government is suable in its own name.²⁸ *Id.*

---

27. Punitive conditions he alleges include "such as not given clean socks, boxers, T-shirts every day and give showers every day, not given three hot meals a day, but ship [*sic*] searches, cell searches, handcuffs, legcuffs, celled with prisoners confined to a cell for 23 hours a day" all "while in the custody of William Kolender, Sheriff. . . ." Opp. pp. 8–9.

28. "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. 2018.

A judgment against a public servant "in his official capacity" under 42 U.S.C. § 1983 imposes liability on the entity that person represents, provided the public entity received notice and an opportunity to respond. *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 658, 690, n. 55, 98 S.Ct. 2018. Nevertheless, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *see also Chaloux v. Killeen*, 886 F.2d 247, 250, 251 (9th Cir.1989) (concluding the *Monell* doctrine was not intended to apply to the situations where plaintiffs seek prospective relief under 42 U.S.C. § 1983 "against the further exercise of governmental authority under an allegedly unconstitutional state statute" and did not intend to apply any "official policy or custom" requirement to foreclose a suit for prospective relief against a coun-

ty or its officials for enforcing allegedly unconstitutional state laws). Munoz does not challenge the constitutionality of California's SVPA statute, nor the outcome of his SVP determination, nor the duration of his civil detention as a SVP. He seeks damages, not merely prospective injunctive relief.

The record presented substantiates state law and a County Jail housing policy called for the administrative segregation of SVPs and was ordered for Munoz while he was temporarily confined in County Jail.[29] Administrative segregation is mandated by statute for "inmates who are held pending civil process under the sexually violent predator laws." PEN.CODE § 4002 (Westlaw 2002). The United States Supreme Court has found that holding SVPs in administrative segregation in penal settings does not violate any constitutional right. *See Hendricks*, 521 U.S. 346, 117 S.Ct. 2072.

Absent a policy, custom, or procedure so seriously deficient as to violate a constitutional right and a showing of direct liability through supervisory management, Sheriff Kolender may not be held liable in his official capacity.[30] *See Monell*, 436 U.S. at

**29.** "Munoz was not housed in the general inmate population [for the period April 20, 2000 to August 14, 2000]. Upon delivery to the San Diego County Sheriff on April 20, 2000, he was classified as a 'protective custody' inmate and housed separately with inmates similarly situated.... Appropriate measures were taken to safeguard Munoz while in the custody of the San Diego County Sheriff while he was awaiting trial." Mot. 6:17–22. Defendant relies on Motion Exhibits "C", "K", and "L". Motion Exhibit "C" is an April 20, 2000 County of San Diego Sheriff's Department Detention Facility Booking and Property Record. Motion Exhibit "K" is a Sheriff's Department Segregated Housing Order also dated April 20, 2000, instructing that Munoz be held in protective custody because he "[h]as been accused of a crime of a nature and sufficient publicity that would place him or her in physical jeopardy if housed in the mainline population...." Motion Exhibit "L" is a Detention Facility Services Inmate Status

Report, also dated April 20, 2000. Munoz was at that point classified as a "protective custody" inmate, housed separately with inmates similarly situated. The interviewing deputy observed: "Because Inmate MUNOZ is charged with 288(A) PC, he must be housed separately from other inmates. *MUNOZ will be housed in Protective Custody for the duration of his stay in San Diego County Sheriff's Department*." Mot. Ex. "L" (emphasis added).

**30.** Munoz raises a triable issue of fact by stating he was not actually housed in segregated confinement but rather was wrongfully placed in the general population when he was transferred to County Jail on February 17, 1998. Opp. p. 11. Defendant maintains "Munoz was not housed in the general inmate population," but has only briefed the year 2000 confinement period. Defendant's Mot. Ex. "K" and "L" reflect segregated housing and protective custody precautions were ordered for Munoz upon his transfer to County

694, 98 S.Ct. 2018; *Redman,* 942 F.2d at 1446–47. Munoz identifies no "policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Mackinney,* 69 F.3d at 1008 (quoting *Redman,* 942 F.2d at 1446). Even if he had, he demonstrates no responsibility for the policy attributed to the County or to Sheriff Kolender. Rather, he alleges he was denied rights purportedly secured by "California's very own state law." Compl. p. 3. He raises no triable issue of fact regarding any affirmative role played by Sheriff Kolender in the alleged deprivation of Munoz's constitutional rights. Therefore, Sheriff Kolender is entitled to summary judgment as to both Munoz's claims for damages and his claim for injunctive relief.

Moreover, Munoz contends his "criminal sentence and probation" period did not end until March 16, 2001. If in fact he was serving a criminal sentence concurrently with his SVPA commitment, he would not enjoy the purely civil status he represents entitles him to the relief he seeks. Unlike the effect of a sheriff's department policy identified in *Streit v. County of Los Angeles,* 236 F.3d 552, 555 (9th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 59, 151 L.Ed.2d 27 (2001), authority relied on by Munoz, the duration of Munoz's custodial detention is not unlawfully prolonged by the challenged County Jail detentions.[31]

■■■ Finally, the fact of Sheriff Kolender's custody of Munoz for the periods challenged in the Complaint was not the result of a Sheriff's Department policy or custom. Rather, Munoz's transfers to County Jail appear all to have occurred pursuant to court Orders that he be remanded to the Sheriff's custody for purposes of availability for civil judicial proceedings.[32] For the year 2000 period addressed in Defendant's Motion, Sheriff Kolender was under court order to retain

---

Jail on April 20, 2000. Munoz's Opposition Exhibit "G" shows administrative segregation was ordered no later than April 1998, indicating the segregation policy existed in all years relevant to the allegations of the Complaint. Even absent comparable exhibits for each period of time, Munoz's constitutional claims against Sheriff Kolender are not resuscitated. The policy, custom, and state law were to administratively segregate SVPs like Munoz.

31. In *Streit,* the court held the sheriff's department was a county actor, rather than a state actor entitled to Eleventh Amendment immunity in a 42 U.S.C. § 1983 action by detainees alleging unlawful detention. The case is distinguishable from Munoz's circumstances. The *Streit* county jail detainees sued the county, the sheriff's department and others, seeking damages for detention in county jails "after all legal justification for their seizure and detention ended," while the Sheriff's Department conducted an automated search of a computerized law enforcement data base to confirm the prisoner is not wanted by any other law enforcement agency. *Streit,* 236 F.3d at 556. Under departmental policy, all warrants and holds arriving through the day of scheduled release were to be input into the data base before the search was run. Due to the high volume of warrants and holds received each day, a delay of one to two days is expected. "It is only after the inputting process is complete and the computer check run, that the LASD begins the administrative steps toward a prisoner's release." *Id.* The result of that policy was to perpetuate the jail confinement of inmates who were no longer required to serve time, extending their incarceration beyond their release date, with no other judicial proceedings pending. Munoz, in contrast, appears to have been at all relevant times in lawful custody under state law, including the SVPA.

32. Despite the absence of Order exhibits to document that authorization for custody changes for other periods alleged in the Complaint, the court assumes all relevant transfers were pursuant to facially valid court orders because Munoz challenges the court's "jurisdiction" to order the custody transfers. *See* fn. 2, above. He does not allege the custody transfers were improper due to the absence of court Orders directing the custody transfers occur.

custody of Munoz without bail in an unspecified "secure facility" and to make him available for court proceedings. *See* Section I.A. The "secure facility" under the jurisdiction of the County Sheriff is the County Jail. At the conclusion of the SVPA proceedings, the court ordered Sheriff Kolender to transfer custody back to the DMH, and the transfer occurred. Those court Orders appear to be facially valid. *See Roland v. Phillips,* 19 F.3d 552, 557 (11th Cir.1994) (an executing law enforcement official is protected by absolute quasi-judicial immunity from suit in 42 U.S.C. § 1983 actions when acting in furtherance of official duties and relying on a facially valid court order, oral or written); *see also Coverdell v. Dept. of Health Serv.,* 834 F.2d 758, 764–65 (9th Cir.1987). Accordingly, it would appear Defendant is protected by absolute quasi-judicial immunity from suit for damages in his official capacity in the execution of the court orders to retain custody of Munoz pending SVP judicial proceedings.

## III. CONCLUSION AND ORDER

For the foregoing reasons, and despite Defendant's incomplete demonstration in his moving papers, the court finds Munoz's allegations against Sheriff Kolender are inadequate to sustain his Complaint. Accordingly, **IT IS HEREBY ORDERED:**

1. Summary judgment is ***GRANTED*** for Defendant;

2. All Case Management dates are vacated; and

3. The Complaint is ***DISMISSED,*** with prejudice.

**IT IS SO ORDERED.**